## 19280

James P. GRAY, Jr., Appellant, v. SOUTHERN FACILITIES, INC., and D. L. Webster, Respondents

(183 S. E. (2d) 438)

*James E. Stephen, Esq.,* of Spartanburg, *for Appellant,*

Robert F. Chapman, Esq., of Butler, Chapman, Parler & Morgan, Spartanburg, for Respondent,

August 31, 1971.

Moss, Chief Justice.

James P. Gray, Jr., the appellant herein, instituted this action against Southern Facilities, Inc., and D. L. Webster, the respondents herein, alleging that on July 30, 1969, as a result of their negligence, carelessness and recklessness in the operation of certain gasoline storage tanks, gasoline was pumped into Four Mile Creek and such was later ignited, resulting in a fire which caused damage to his property, the smoking of his home, great depreciation in the value of his property, and depriving him of the full enjoyment and use of his residence.

The respondents, by their answer, admitted so much of the complaint as alleged that on July 30, 1969, they pumped certain petroleum products into Four Mile Creek and such flowed down stream and was later ignited, resulting in a fire, but denied any liability therefor to the appellant.

This case came on for trial before The Honorable Wade S. Weatherford, Jr., presiding judge, and a jury, at the 1970 June Term of the Court of Common Pleas for Spartanburg County. At the conclusion of the appellant's case, the respondents moved for and were granted an involuntary nonsuit on the ground that even though the respondents may have been negligent, careless and reckless, the appellant had

sustained no actual or physical damages resulting therefrom and consequently he was not entitled to a recovery therefor. This appeal followed.

The appellant owns and resides in a duplex apartment in close proximity to Four Mile Creek. The appellant, with his family, occupies one side of the duplex and the other side is occupied by a tenant, and was so occupied at the time of the fire and at the time of the trial of this case.

Four Mile Creek flows in an easterly direction and in its course "horseshoes" around the rear portion of the appellant's duplex. There is a wooden bridge across Four Mile Creek between 2/10 and 3/10 of a mile east of the appellant's duplex. Some distance upstream from the duplex of the appellant, the respondent, Southern Facilities, Inc., owns and maintains gasoline storage tanks and on the day of the fire D. L. Webster was managing and in charge of such storage tanks. Three other petroleum companies have gasoline storage tanks adjacent to Four Mile Creek and also upstream and west of the properties of the appellant and the respondent.

It appears that on July 30, 1969, D. L. Webster, in the process of separating or removing accumulated water from a gasoline storage tank, by mistake, pumped approximately four hundred gallons of gasoline into Four Mile Creek. The gasoline flowed downstream and passed the appellant's property and became partially slowed up or dammed behind debris at the bridge hereinbefore referred to. Thereafter, the gasoline was ignited by unknown means and burned upon the surface of the creek for a distance of several hundred feet on each side of the bridge. According to an eye witness the fire burned for about two hours, causing damage to trees and shrubbery along the bank of the creek for several hundred feet before being brought under control and extinguished by fire fighting units. The father of the appellant, who lives next door, testified that the fire did not damage his son's property or home but the stream shortly after the fire had a greasy or oily appearance.

The appellant, testifying in his own behalf, estimated that because of the fire the value of his property had been decreased in the amount of $6,000.00. This testimony was given in the absence of the jury and over the objection of the respondents. As to whether or not there was any damage to the appellant's residence, the following is taken from the record:

"The Court: Before we get into that, let's get Mr. Gray to say whether or not there was any physical damage done to his land or the building on it.

"Q. Your house has a heat pump and it is air-conditioned?

"A. Yes, sir.

"Q. It was closed up that day?

"A. Yes, sir. It has storm windows on it also.

"Q. All right. Was there any visible physical damage as far as vegetation or burning or anything like that?

"A. Not on my property. There was not any flame being ignited. There was petroleum product on the creek on the edges of my property which was on the creek, and there was heavy smoke throughout the whole neighborhood down along both creek banks.

"Q. Were there fumes, the fumes heavy?

"A. Yes, sir, fumes very heavy. You could tell the odor. The odor had been there before.

"The Court: That was in the area generally now and did not get into your home?

"A. The odor came up out of my creek which is ten feet from one corner and 20 feet from the other corner.

"The Court: Have you had to incur any expense in order to make repairs on your property, such as painting the outside for smoke damage, or having the inside fumigated for gasoline odor damage. That's what we are trying to get at.

"A. No, sir."

Even though the appellant testified that gasoline fumes were present in the neighborhood, he did not say they were

noxious or offensive to him or that such caused him any discomfort, illness, annoyance or inconvenience. The appellant did not testify as to any diminution in the rental or usable value of his property.

In the absence of the jury, the appellant presented Leonard Still and T. B. Thackstone, local real estate agents, as witnesses, and they testified as to how the fire had affected the value of his property. It was their opinion that prior to the fire the property had a value of $26,500.00 but after the fire its value had depreciated approximately 10%, or $2,650.00. On cross-examination of the witness, Still, he gave the following testimony:

"Q. And you believe the property has been damaged because of the fire, is that right?

"A. Mr. Chapman, I would like to say this, it does not have any physical damage, actual physical damage to the property but we are speaking of the damage to the resale value to the piece of property.

"Q. Now, if there were no way for petroleum products to get into this stream so there could be another fire there would be no damage would there?

"A. I can't say that for this particular reason: you may abate the possibility of petroleum products going into the stream, but it is another thing to convince the public that this has been done.

"Q. Suppose the plants were removed?

"A. That would be another matter of course.

\* \* \*

"Q. All right. Now, in examining the lot and and property of Mr. James P. Gray, Jr., you found no physical evidence of the fire?

"A. No, sir.

"Q. No burned trees, shrubbery, and no smoke damage to the house?

"A. No, sir.

"Q. Now, you state that in your opinion this property has been devalued 10% because of this history?

"A. Yes, sir, approximately.

"Q. This is really a damage to reputation of the property, wouldn't you say Mr. Still?

"A. Yes, to a degree, that's correct.

"Q. Well, you can't see it can you?

"A. No.

"Q. If you went out there today there would be absolutely no evidence that there had ever been a fire would there?

"A. No sir.

\* \* \*

"Q. So what you are talking about is damage that people have in their minds because of a history of something that has happened?

"A. Yes, sir.

"Q. And damage through fear that this might happen again?

"A. That's about it, yes, sir."

The witness Thackston, on direct examination testified as follows:

"Q. Do you have an opinion as to whether or not that duplex and the land on which it is situated, was depreciated in value after the fire, and as a result thereof?

"A. Well, the building and the property was not damaged by the fire, physically damaged. In my opinion—

"Q. How was it damaged then?

"A. It damaged, the value of the property was damaged, the resale value."

On cross-examination the witness Thackston testified as follows:

"Q. Now, Mr. Thackston, I believe you say that the real damage to this property is due to the reputation to the area now that there has been a fire?

"A. That's right. There was no physical damage to the property at all, Mr. Chapman.

"Q. And now that there has been a fire, and you say people know there are petroleum facilities up the creek from this property?

"A. That's right.

"Q. As long as these petroleum facilities are there this property is going to be damaged in reputation?

"A. I think so, because nobody can say it won't happen again, Mr. Chapman.

"Q. So your opinion is based upon the assumption of a future discharge into the creek and a future fire?

"A. It is based on the assumption, I mean on the fact that they have had one and the assumption that there might be some more. Now if I knew, Mr. Chapman, that there would never be another fire, another discharge of petroleum in the area that would cause fire, there has been no damage.

"Q. Now you say you went into the house?

"The Court: That is the crux of the issue. He hit it right sqarely on the head. It is based upon the possibility in the minds of the public, that's what he is saying, in the minds of the public, that it will occur again. All right, go ahead.

"Q. You went into the house?

"A. Sir?

"Q. You went into the duplex?

"A. Oh, yes.

"Q. And you found no physical evidence of smoke damage?

"A. No, no damage to the house and I saw no damage to the stream.

"Q. Or the undergrowth or the trees?

"A. No.

"Q. If you hadn't known about the fire before you went out there you would never have known there been one?

"A. That's right.

We have carefully reviewed all of the testimony in this case and fail to find therefrom that the appellant's duplex or property was in any manner dam-

aged by fire, smoke or fumes which were emitted from Four Mile Creek on July 30, 1969. On the contrary there is ample evidence that no physical damage was done to appellant's property and the actual fire was some distance downstream from his property. There is no evidence on behalf of the appellant that he or his family sustained any personal injury, discomfort, illness, annoyance, or inconvenience as a result of the fire in the creek.

It is the position of the appellant that the trial judge was in error in not submitting to the jury the question of whether he had sustained damages as a result of the negligence of the respondents. The trial judge found as a matter of law that the appellant had sustained no physical damage to his property nor had he suffered any personal injury as a result of the fire. We think his conclusion on this question was correct. It is basic that a negligent act is not in itself actionable and only becomes such when it results in injury or damage to another. 38 Am. Jur., Negligence, Sec. 28, page 673. In *National Loan & Exchange Bank v. Lachovitz,* 131 S. C. 432, 128 S. E. 10, we said:

"It is fundamental and elemental that, in order to reap the benefit of negligence, the person pleading negligence must show that he has been injured by the negligence, and that the negligence was the proximate cause of the injury."

The appellant, having failed to prove any actual damages, is not entitled to recover nominal damages, since a cause of action for negligence occurs only when injury or damage have been caused thereby to the complaining party. 25 C. J. S. Damages § 10, page 641; 22 Am. Jur. (2d) Damages, Sec. 8, page 23. It follows that the trial judge was correct in not submitting the question of either actual or nominal damages to the jury.

The appellant contends that the trial judge erred in treating this as a negligence case and should have held that the respondents were liable for the creation and maintenance of a nuisance.

The appellant's claim for damages, as such is stated in his complaint, is based solely on negligence and there was no claim therein of a cause of action based on the theory of a nuisance. The complaint alleges, and the testimony shows, that there was only one escape of gasoline into Four Mile Creek caused by the negligence of the respondents. The general rule is that the maintenance of a nuisance implies a continuity of action over a period of time. There is authority, however, for the proposition that under some circumstances a single act may establish the maintenance or continuance of a nuisance, that is when a single act produces a continuing result the offense may be complete without a recurrence of the act. 39 Am. Jur. Nuisances, Sec. 22, page 303. A nuisance generally involves the idea of continuity or recurrence, rather than occasional or temporary injury or annoyance. 66 C. J. S. Nuisances § 18d, page 766. A single isolated occurrence or act, which if regularly repeated would constitute a nuisance, is not a nuisance, until it is regularly repeated, *Southeastern Liquid Fertilizer Company v. Chapman*, 103 Ga. App. 773, 120 S. E. (2d) 651; *Johnson v. City of Atlanta*, 177 Ga. App. 586, 161 S. E. (2d) 399. In the instant case the complaint alleges, and the evidence shows, a single isolated act of negligence, not continuous or recurrent, and this is not sufficient to show a nuisance. The evidence does not show that this one fire has caused either permanent or temporary physical damage to the property or person of the appellant. We find no error on the part of the trial judge in viewing this case as one based solely on negligence as the pleadings and evidence raise no issue as to the creation and maintenance of a nuisance.

The appellant contends that as a result of the fire caused by the negligence of the respondents, his property has been depreciated in value and this was sufficient to require the submission of the amount of damages so sustained to the jury. The essence of the appellant's contention is that his property has a "bad reputation" and

has depreciated ten percent in market value due to the fire and the possibility of a like occurrence some time in the future.

The appellant and two real estate agents, out of the presence of the jury, testified that the fire had given the property of the appellant a "bad name" and its market value and sales potential had been reduced and diminished. It was the opinion of these witnesses that prospective buyers would consider the possibility of a recurrence of the fire.

The general rule is that in case of an injury of a permanent nature to real property, by the pollution of a stream, the proper measure of damages is the diminution of the market value by reason of that injury, or in other words, the difference between the value of the land before the injury and its value after the injury. Where the pollution of a stream results in a temporary or nonpermanent injury to real property, the injured landowner can recover the depreciation in the rental or usable value of the property caused by the pollution. See the cases collected in 49 A. L. R. (2d), page 253, and 22 Am. Jur. (2d) Damages, Sections 134-135, pages 194-198.

Here the basis of appellant's claim for damages is predicated upon an asserted diminution in market value resulting, not from any physical injury, but from a psychological factor, in that prospective buyers allegedly would be reluctant to purchase the property due to the fear of a similar occurrence in the future. In 22 Am. Jur. (2d) 199, Damages, Sec. 136, it is said:

"* * * injury to the reputation of * * * property has been held not to be a proper element of damages."

Research, however, would indicate that very few cases have considered any such issue, but see *Delano v. Smith,* 206 Mass. 365, 92 N. E. 500; *Morgan v. Hightower's Adm'r,* 291 Ky. 58, 163 S. W. (2d) 21; *Douglas Aircraft Co. v. Kerns,* 10 Cir., 164 F. (2d) 1007; and *Oklahoma City v. Page,* 153 Okl. 285, 6 P. (2d) 1033.

It would not appear from these cases that any general or firmly established rule has as yet been developed. Under the circumstances of this case we deem it unnecessary for us to decide whether or not, or under what circumstances, damages might be recovered for injury to the reputation of real property.

There is admittedly evidence from expert witnesses to the effect that the market value and sales potential of appellant's property have been reduced and diminished as a result of respondents' delict and the following fire. The evidence, however, reflects considerable dissimilarity in the one experience cited by these experts as the basis of their opinions as to the amount of such diminution. From the evidence it appears that petroleum products were in the creek from time to time on other occasions, but no evidence tending to connect the respondents, rather than other petroleum plants up the stream as a source thereof. The existence of four petroleum plants, including that of respondents, upstream and spillage of petroleum products therefrom into the creek from time to time would have a natural tendency to adversely affect the market value of appellant's property. When these factors are added to the single delict charged to the respondents and the ensuing fire it is readily inferable that appellant's property is less desirable, and consequently less valuable than it would have been had none of these circumstances, adversely affecting it, ever existed or occurred. The appellant and his witnesses, however, seek to attribute all diminution in value to a single delict on the part of the respondents and the single fire which occurred, entirely beyond the bounds of appellant's property and at a considerable distance.

While proof, with mathematical certainty, of the amount of loss or damage is not required, in order for damages to be recoverable the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy. Neither the existence, causation nor amount of damages can be left to conjecture,

guess or speculation. See *Piggy Park Enterprises, Inc. v. Schofield,* 251 S. C. 385, 162 S. E. (2d) 705, and cases therein cited.

The evidence as to the diminution of market value is, in our view, speculative, not only as to the amount but speculative as to the portion thereof proximately and directly resulting from the one delict on the part of the respondents complained of and proved. Accordingly, such evidence was of no real probative value in ascertaining the amount of any actual damage to the market value of appellant's property resulting from respondent's single wrongful act.

The appellant's final contention is that he has been denied due process of law under the Constitution of this State and of the United States because the trial judge refused to submit to the jury the question of damage to the market value of his property. We find no merit in the appellant's argument. As we have already held, the evidence offered in support of appellant's claim for damages was speculative and insufficient to support a recovery. As we understand the due process clause, such does not entitle a litigant to have his case submitted to the jury where he has failed to sufficiently prove any legally recognized or accepted element of damage. We conclude that the trial judge committed no error in granting the involuntary nonsuit and the question here posed is answered adversely to the contention of the appellant.

Affirmed.

LEWIS, BUSSEY, BRAILSFORD and LITTLEJOHN, JJ., concur.