529 S.E.2d 764

**YADKIN BRICK COMPANY, INC., and Contamination Reclaiming Services, Inc., Plaintiffs,**

v.

**MATERIALS RECOVERY COMPANY, a Limited Partnership, Soil Remediation Corporation (USA), its General Partner, Foster Dixiana Corporation, Nu–Way Environmental, Inc., Jonathan K. Rabley, and Eastman Chemical Company, Defendants.**

**Nu–Way Environmental, Inc., and Jonathan K. Rabley, Third Party Plaintiffs,**

v.

**Yeargin, Inc., Third Party Defendant,**

**of whom Yadkin Brick Company, Inc. is, Appellant/Respondent,**

**and Eastman Chemical Company, is, Respondent/Appellant.**

**No. 3148.**

Court of Appeals of South Carolina.

Heard Jan. 11, 2000.

Decided April 10, 2000.

---

George A. Kastanes, of Gilbert, for appellant/respondent.

Robert Y. Knowlton and Henry J. White, both of Sinkler & Boyd, of Columbia, for respondent/appellant.

STILWELL, Judge:

Yadkin Brick Company, Inc. brought this action seeking damages from Eastman Chemical Company and others after contaminated material from Eastman was shipped to Yadkin's brickyard for disposal. Yadkin appeals the trial court's directed verdict on its claim for diminution in property value and the court's application of an offset for settlement amounts Yadkin received from other defendants in this action. Eastman cross appeals, alleging the trial court erred in denying its motion for a directed verdict on Yadkin's negligence cause of action. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

This case arises from a contract for the cleanup of a basin at the Eastman plant located in Calhoun County. In the early 1990s, Eastman decided to replace its Dowtherm basin, an outdoor concrete basin primarily used to recover leaks from failed pump seals. For the last sixteen years, a sludge containing grit, sand, fuel oil, Dowtherm, and other materials had accumulated at the bottom of the basin. Dowtherm is a heat transfer liquid used by Eastman in its production of plastic pellets. It is not considered a hazardous material pursuant to the principal federal law and regulations governing disposal of this type waste.

In conjunction with the basin's replacement, Eastman asked Westinghouse to run analytical laboratory tests on samples taken from the basin. A Westinghouse report dated January 8, 1992 indicated that no Dowtherm was detected in the samples.

Eastman hired Yeargin, Inc., a construction company, to solicit bids from specified disposal companies for removal of the sludge. Yeargin awarded the contract to Nu–Way Envi-

ronmental, Inc. Nu–Way, in turn, contracted with Soil Remediation Company (SRC), now known as Materials Recovery Company, to dispose of the solidified sludge. SRC had a marketing agreement with Yadkin and arranged, with Eastman's approval, for the sludge to be delivered to Yadkin's property. Yadkin, which possessed permits from North Carolina environmental authorities allowing it to incorporate defined proportions of petroleum-contaminated soils into its brick-making process, intended to use the sludge for that purpose.

On July 1, 1992, after the removal and delivery of Eastman's sludge was underway and Yadkin had received approximately 850 tons of the material, Yadkin stopped accepting further shipments because of the sludge's extremely strong odor. When effluent material began running from the sludge and Yadkin was unable to contact Eastman personnel for advice, they mixed the sludge with over 3000 tons of other material. On July 6, 1992, Yadkin's owner, Jerry Jordan, finally reached personnel at Eastman and was advised that Eastman's sludge contained Dowtherm. Yadkin's permits did not include an authorization for processing or storing Dowtherm.

Yadkin's original action was instituted in 1992 after the companies involved were unable to come to terms over the removal of the contaminated soil. Its current amended complaint was filed in 1997. Yadkin alleged several causes of action, including negligence, breach of contract, and nuisance, and sought recovery for the cost of cleanup, lost profits,[1] and other damages. Yadkin also claimed a diminution in property value because of the presence of the Dowtherm-contaminated soil. At the time of trial, the brickyard had been sold to a third party.

By the time the case went to the jury, most of the original parties had settled and only Yadkin and Eastman remained in the suit.[2] The jury returned a verdict in favor of Yadkin for

1. Yadkin consented at trial to a directed verdict in favor of Eastman on its lost profits claim.

2. Prior to trial, all claims with regard to Yeargin, SCR (and the related entities of Materials Recovery Co.), Soil Remediation Corp. (USA), and Foster Dixiana Corp. were settled and the parties dismissed. During

$255,000 actual damages, assigning thirty-nine percent comparative negligence to Yadkin and sixty-one percent to Eastman. The trial court reduced the verdict to $155,550 in conformity with the jury's determination of Yadkin's comparative negligence. Further, the trial court determined that Eastman was entitled to an offset of $351,000 for the amounts Yadkin received in settlement, leaving no monies due Yadkin. Both Yadkin and Eastman appeal.

## DISCUSSION

### I. Yadkin's Appeal

A. Directed Verdict on Yadkin's Claim for Diminution in Property Value

■ At trial, Eastman moved for a directed verdict on Yadkin's claim for diminution in property value, arguing Yadkin had failed to show a permanent injury to the property. The trial court agreed and granted Eastman's motion. Yadkin contends the trial court erred in granting the directed verdict in favor of Eastman. We disagree.

■ When reviewing a motion for a directed verdict, a trial court must "view the evidence and all reasonable inferences in the light most favorable to the non-moving party." *Swinton Creek Nursery v. Edisto Farm Credit, ACA,* 334 S.C. 469, 476, 514 S.E.2d 126, 130 (1999). A directed verdict is properly granted when the evidence yields only one inference. *Id.* On review, this court may only reverse the trial court if there is no evidence to support the trial court's ruling. *Id.* at 477, 514 S.E.2d at 130.

■ Under South Carolina law,
[t]he general rule is that in case of an injury of a *permanent* nature to real property ... the proper measure of damages is the diminution of the market value by reason of that injury, or in other words, the difference between the value of the land before the injury and its value after the injury. Where the pollution ... results in a temporary or nonpermanent injury to real property, the injured landowner can

---

trial, Yadkin, Nu–Way, and Nu–Way's president, Jonathan Rabley, entered into a settlement and were also dismissed as parties.

recover the depreciation in the rental or usable value of the property caused by the pollution.

*Gray v. Southern Facilities, Inc.,* 256 S.C. 558, 569, 183 S.E.2d 438, 443 (1971) (emphasis added); *see also Ravan v. Greenville County,* 315 S.C. 447, 465, 434 S.E.2d 296, 307 (Ct.App. 1993) ("The measure of damages for permanent injury to real property by pollution, whether by nuisance, trespass, negligence, or inverse condemnation is the diminution in the market value of the property.") (footnote omitted). The amount of damages need not be proved with mathematical certainty. The evidence, however, should be such that a court or jury can reasonably determine an appropriate amount. *Gray,* 256 S.C. at 570, 183 S.E.2d at 444. "Neither the existence, causation nor amount of damages can be left to [the judge or jury's] conjecture, guess or speculation." *Id.* at 570–71, 183 S.E.2d at 444. Moreover, bald allegations are insufficient to establish a claim for diminution in value, and the evidence must not be speculative as to the amount of the alleged diminution. *See Baughman v. American Tel. & Tel. Co.,* 306 S.C. 101, 410 S.E.2d 537 (1991).

In support of its argument that it presented evidence sufficient to create a jury question, Yadkin cites the discrepancy between the estimated value of the property and its sale price. Fred H. Beck, a real estate appraiser who had previously provided appraisals for Yadkin when the company applied for financing, estimated the value of the property in 1996 to be $2,585,000, exclusive of any consideration for the Dowtherm contamination. Interestingly, no one indicated to Beck during the loan process that the Dowtherm-contaminated soil could impact the value of the property. When asked his opinion during the litigation as to the diminution in property value resulting from the presence of Dowtherm on the property, Beck stated that such an opinion was beyond his expertise.

Jordan purchased the Yadkin Brickyard in 1990 for approximately $850,000 and owned it at the time this incident occurred. Jordan testified that he listed the property for sale at $2,800,000, basing this figure on the brickyard's productivity, its value as an operating contamination reclaiming business, and his knowledge of the brick industry. However, no offers were received at that asking price.

In 1996, the brickyard was sold to Edward Craig Sasser for $1,800,000, which included $500,000 in inventory and a promise that the property would be cleaned up within three years. Thus, the sales price attributable to the property itself without the extra inventory was $1,300,000. Jordan testified he attributed the difference in price between what he believed the property was worth and its ultimate selling price on "the fact that we had been knocked out of the contamination reclaiming business" which was "vitally important" to the plant's survival. Although Sasser testified Jordan informed him of the contamination and that he took it under consideration when negotiating for the property and its cleanup, Sasser's statements fall far short of indicating that he purposefully subtracted a certain sum because of the Dowtherm on the property and/or the possible loss of use of one holding area.

Michael T. Stanforth, Yadkin's expert witness on remediation and cleanup of petroleum-contaminated soil, testified about the remediation of the Dowtherm-contaminated soil. Stanforth estimated cleanup costs for removing the soil to be $255,000. Stanforth testified that upon taking samples, he discovered free liquids at the base of the stockpile. Although he noted that "there's a possibility of additional migration of the Dowtherm down into the clay or the underlying groundwater," Stanforth never indicated that the property could not be adequately cleaned up or that the contamination would result in permanent injury.

We agree with the trial court's conclusion that Yadkin failed to present any evidence of a *permanent* injury to its property to warrant submission to the jury of a claim for diminution in property value. There was no evidence presented to establish that damage to the property would continue to exist once the cleanup was accomplished.

Yadkin argues, however, a novel theory of permanency. Its contention is that since the property was sold during the pendency of the action and, according to Yadkin's view, the sales price was depressed due to the presence of the Dowtherm-contaminated soil, the damage to Yadkin is therefore permanent. This is not, however, the correct analysis. Yadkin must prove that the damage is permanent to the property,

not just to itself. *See Gray,* 256 S.C. at 569, 183 S.E.2d at 443; *Ravan,* 315 S.C. at 465, 434 S.E.2d at 307.

The reasoning of the court in *Gray* would allow for the recovery of personal damages to the landowner when pollution only temporarily injures real property. *See Gray,* 256 S.C. at 569, 183 S.E.2d at 443. However, at trial Yadkin abandoned any claim for lost profits and consented to a directed verdict on this point.

We agree with the trial court's decision to remove from the jury's consideration any question of permanent damage by way of diminution of value of the property from the contamination and instead submit only the issue of cleanup costs.

B. Offset for Settlement Amounts

 Yadkin also argues the trial court erred in allowing an offset of the amounts it received in settlement from other defendants.

After the jury's verdict, Eastman's counsel moved the court to apply an offset of $351,000—the amount Yadkin received in settlement from other defendants. The trial court granted the motion, explaining that it would apply a $351,000 offset which would result in the verdict being offset in its entirety with no further recovery to Yadkin. Yadkin asserted no argument at trial that the offset was improper. Further, when the court asked for any post-trial motions, Yadkin's counsel stated, "I have no motions to make, your Honor." Finally, Yadkin did not challenge the propriety of the offset by means of a Rule 59(e), SCRCP motion.

Because Yadkin failed to raise this issue below, it is not preserved for our review. *See Wilder Corp. v. Wilke,* 330 S.C. 71, 497 S.E.2d 731 (1998) (explaining that alleged error must be raised to and ruled on by the trial court to be preserved for appellate review). Moreover, Yadkin conceded at oral argument that this issue was not preserved.

## II. Eastman's Appeal

 Eastman contends the trial court erred in denying its motion for a directed verdict on Yadkin's negligence cause of action. Yadkin's failure to preserve the issue of set-off and our affirmance of Eastman's directed verdict on the diminu-

tion in property value results in no further monies due Yadkin. Thus Eastman's appeal of the negligence cause of action is rendered moot.[3] *See Gainey v. Gainey,* 279 S.C. 68, 69, 301 S.E.2d 763, 764 (1983) ("This Court will not issue advisory opinions on questions for which no meaningful relief can be granted.").

For the foregoing reasons, the decision of the trial court is

**AFFIRMED.**

CONNOR and ANDERSON, JJ., concur.

---

**3.** Eastman concedes in its brief that its "cross-appeal may not need to be addressed ... unless the trial court is reversed and the case is remanded for further proceedings."