671 S.E.2d 79

Samantha GAULD, Appellant,

v.

O'SHAUGNESSY REALTY COMPANY d/b/a Prudential Carolina Real Estate, Chip Allen, Julie Lynch, and Raymond Harris, Defendants,

Of whom O'Shaugnessy Realty Company d/b/a Prudential Carolina Real Estate, Chip Allen, and Julie Lynch are the, Respondents.

No. 4455.

Court of Appeals of South Carolina.

Submitted Nov. 5, 2008.
Filed Nov. 14, 2008.
Rehearing Denied Jan. 27, 2009.

R. Clenten Campbell, of Walterboro and Jonathan F. Krell and Alan Toporek, both of Charleston, for Appellant.

Michael Scarafile, of North Charleston and Michael Scardato, of Charleston, for Respondents.

ANDERSON, J.:

Samantha Gauld (Gauld) appeals the summary judgment granted in favor of Respondents on her claims for breach of contract, breach of contract with a fraudulent act, breach of fiduciary duty, negligence, negligent misrepresentation, and violation of the South Carolina Unfair Trade Practices Act. We affirm.[1]

## FACTUAL/PROCEDURAL BACKGROUND

In this case arising from Samantha Gauld's purchase of 102 Lucretia Lane in Summerville, she alleged breach of contract, breach of contract accompanied by a fraudulent act, breach of fiduciary duty, negligence, violation of the South Carolina Unfair Trade Practices Act, and negligent misrepresentation against her real estate agent, Julie Lynch (Lynch); the agent of the seller, Chip Allen (Allen); and the employer for both, O'Shaugnessy Realty Company d/b/a Prudential Carolina Real Estate (Prudential).

At the hearing for the defendants' motion for summary judgment, Gauld agreed to dismiss the breach of contract

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

claim against Allen. The circuit court expounded in its order, "there is no admissible or credible evidence as to the existence or amount of any alleged damage and, as such, summary judgment is appropriate as to all Defendants and all causes of action."

Over a fifteen year period preceding this action, Gauld purchased, refurbished and resold numerous homes across the country. In fall of 2002, while living in Maine, Gauld became interested in the Charleston market. After deciding Charleston was beyond her budget, her search expanded to include the Summerville area. Ideally, she sought a historic property suitable as a bed and breakfast. If real estate with these characteristics could not be found, Gauld had a "Plan B" which entailed "a short term investment that I expected to make a big profit on in a very short period of time while we continued to look for a historic property."

Gauld made trips from Maine to South Carolina in 2002, 2003, and 2004, and she enlisted the services of Lynch, a real estate agent with Prudential's Mount Pleasant office. Gauld and her husband routinely reviewed realty websites and discovered 102 Lucretia Lane in the Tea Farm subdivision. The owner had relocated out of state and hired Allen, an agent with Prudential's Summerville office, to sell the home.

Gauld offered to buy the residence "as is" for $400,000, but made the deal contingent upon her satisfaction with a home inspection and an appraisal at or above the purchase price. After the home inspection and an appraisal valuing the home at $420,000, Gauld accepted the property "as is" and closed in May 2004. She and her husband moved in and made substantial repairs. Gauld testified that, within a week of closing, she was approached by a landscaper asking to cut her lawn. Through their conversation, she became aware of the proposed extension of Phase III of the Berlin G. Myers Parkway along the Sawmill Branch, three hundred feet behind the home. According to Allen's deposition, Phase III has been discussed over the last thirty-five years with citizens and environmental attorneys resisting its construction. Phases I and II were completed years ago. Approximately six months after the closing on 102 Lucretia Lane, a Dorchester County tax referendum passed providing potential funds for road projects. In

Allen's estimation, this event made the construction of the road a "probability."

Multiple appraisals were conducted on 102 Lucretia Lane valuing it at $570,000 in April 2005, $605,000 in May 2005, and $650,000 in January 2006. On January 4, 2005, Gauld put the property up for sale with an asking price of $650,000, which she later increased to $660,000. In June 2005, the house was advertised at $660,000, and a listing in the record, dated July 7, 2006, features a price of $787,500. When asked why she listed the home at more than its appraisal, Gauld explained:

A:  Again, I'm not a realtor, but usually when you're selling real estate, you don't put the price you want. You add a little on top. No one is ever going to offer you what you're asking, that I'm aware of. Secondly, there was some personal property conveyed, and that value was not reflected in here. I, also, in following the local comps, was aware that land right in Tea Farm was selling for—like, a cluster lot was selling for 200,000, and my opinion, my lot, a portion of the price was low in here. I'm not an expert, but to me it seemed a little low on the golf course. I have great views. That's just my personal opinion. That means nothing. I'm not an appraiser.

Although Gauld's deposition is difficult to follow, it indicates she received offers of $650,000, $629,500, and $665,000. Additionally, she averred to having been offered $630,000 in a cash deal. In her deposition, Gauld was asked about the home's worth:

Q:  [Y]ou've listed it more than what it appraised for throughout the whole thing. You keep listing it at higher [than] the appraisal when you know that an appraisal is going to require it be reduced?

A:  Maybe, maybe not. I don't know that.

Q:  Have you examined—this property now as I understand it, in your estimation, what should it sell for?

A:  Well, there's two answers to that question. There's what it should be worth without the parkway. And if I were to buy into the theory that not only does the parkway not negatively impact this property and yet it's actually a positive selling point, and if you look at

the comps currently in Tea Farm, there's a property listed on East Johnson Street at $305 a square foot. There's a property that just sold right behind mine at 160 a square foot. And say I hypothetically accept that my property is not superior to that on East Johnson at 305 a square, yet I believe it's definitely superior to the property that just sold on East Shephard at 160 a square foot, if you cut that down the middle, my property without the parkway will be would over a million dollars, if you do the math. Now, because of the parkway, I would never get anywhere near that amount of money.

Jeffery Wyman, Gauld's expert witness, opined the house was worth a maximum of $650,000. Wyman was asked about the increase in property values in the neighborhood:

Q: Okay. Do you have an idea of the average annual appreciation for Tea Farm and the Miler Country Club area for the last five years?

A: I didn't do an appreciation study, per se. But if we look at sales and resales of houses—for example, the Gauld house, which is the subject of this, she purchased at 400,000 approximately two years ago and at least got an offer of 650 to 665. So you're talking about 50 percent over two years—45 percent. So it's probably in the neighborhood of any where from 15 to 20 percent average. But, again, the latest statistics I saw show the prices going down, people reducing prices to move property.

When shown the listing for Gauld's first attempt to sell the house, Wyman stated:

A: This is 1–4–05. Okay, this is a listing, she's asking $660,000, which is about six months, more or less, after she purchased it.... She listed it in January for apparently $660,000.

Q: And as far as you're—within six months of a sale and appraisal, a sale at 400,000 and an appraisal at 420, in your opinion, is that a realistic listing price?

A: Well, if we made the assumption that the 420 was the market value, my assumption, this would be rather substantial—to me, it would be overpriced at that point.

Q: And that's just based upon assuming that it was 420?

A: Right. Again, I didn't do an appraisal. I didn't go back and look at the market at that time.

Q: Are you aware of any improvements or changes that she made in the property?

A: She—when I interviewed her, she said that she made, I believe $50,000 worth of repairs, to include the pool and—I don't remember all of them, but she made—she alluded to me that she made approximately $50,000 worth of repairs.

Q: Even with the 50,000, and if there are repairs on there, is that still high?

A: Again, I'm not trying to evade your question, but I don't know what all the repairs were. I don't know what the state of the house was when she bought it. Obviously she felt it was worth 400,000, and some appraiser felt like it was worth 420. Now, you can do a lot of cosmetic work for $50,000. And cosmetic work, a lot of times people buy the sizzle. They buy the—but I don't know that it would get to this level.

Q: This 660, you don't think that—

A: Right, it would be a stretch.

Wyman was not asked to appraise other property along the proposed parkway nor conduct appraisals considering noise impact or the value of the 102 Lucretia Lane with or without the parkway in place:

Q: [M]y question was, you were not asked to give a valuation [of what the property was worth with the road or without the road]?

A: No, I didn't quantify any amount. I'm not sure you could. By making that answer, I'm not saying that there isn't a law of diminution in value. I'm just not sure how you quantify it. We like to have comparative sales, but usually on high-end properties like that, you've got noise attenuation devices such as sound walls and things like that.

Allen answered questions concerning his method of valuing homes. At his deposition, Allen was asked whether he currently had any homes listed at a price he considered to be in

excess of ten percent of their actual worth. In this context, a discussion arose concerning 106 E. Johnston, the Tea Farm home with the higher square footage price Gauld cited in deriving her valuation of her home. The property had a current list price of $1.1 million, but in Allen's opinion is was likely worth $950,000.

He explained 106 E. Johnston was built in the 1950s, featured a pool, pool house, an additional 1000 feet of unfinished space, a two-acre lot, exceptional landscaping with two-hundred year old live oaks, and was completely remodeled in 1994 by three professional interior designers. Allen called 106 E. Johnston "a very unique property," "an extraordinary property," and "probably one of the three top houses in the whole Summerville area." He based his estimated value of $950,000 in part on historic properties in Summerville because he believed the home was "more in that category than a typical subdivision house, which most of the houses in the Tea Farm are . . . ."

Later in the deposition, Allen was asked his opinion of a fair listing price for 102 Lucretia Lane. He replied:

A: I would say that—it's hard to tell without looking at it, and I haven't seen—I understand that she's done some improvements to it. But not having seen what the improvements are, I can give you a range, but you know, I would—I would say a range might be between five and a quarter and six, somewhere in that range.

Q: Okay. If you'll give me second, I'll pull out my calculator. I just want to get a general idea. That apparently will take forever. Hang one second here.

My client's house is roughly 4600 square feet; does that sound about right?

. . .

A: Or 45.

Q: Yeah, 45. On the high end of 600,000, and I know that I'm not—I mean, obviously you're just giving me some ball park numbers—that's about $133.00 a square foot—

A: Uh-huh.

Q: —for that property. Are the sales inside Tea Farm subdivision, is that what the comparable properties are doing, 133 a square foot?

A: I haven't seen a look at an analysis recently so I don't know what they are. It's—

Q: Does that sound low, or does that sound high?

A: It sounds about right. Sounds about right to me.

Q: The property that we discussed earlier on Johnston Street, what did you say that square footage was?

A: Finished and heated square footage, it's 4000 because if you count the poolhouse, which is heated, cooled, and it's got a bathroom, so a full bath.

Q: Okay. And if we use the ten percent less number of 950,000, that's $237.00 a square foot.

A: Yeah. I'm telling you that is out of the box. That is an out of the box listing, and you just cannot compare an out-of-the-box listing with something that is more in the box, and 102 Lucretia's in the box. If you'd take a look at the house, 300 Elizabeth, 6000 square feet, just sold for $650,000.00, which is less that 110 a square foot. So, I mean, some—some things are just out of the box and—if you look at East Johnston and put that up there, you're talking an apple and an orange or maybe an apple and a grapefruit.

Q: Do homes on Lucretia Lane, to your knowledge, again, do they sell for more than 133 a square foot? I mean, have there been some comparable sales back there? I know you haven't recently, but you know the market pretty good.

A: Yeah. As far as whether they have sold for over 133 a square foot?

Q: Yes, sir.

A: I'm not real sure. I don't think—I don't really think they have been sold for over 133 a square foot on Lucretia. I could check my records for you.

Despite Allen's insistence that 106 E. Johnston was in a different class than the 4500 square foot 102 Lucretia Lane, Gauld entered into the record a document titled "Fair Market

Analysis of 102 Lucretia Lane" that relied in part on the list price of the $1.1 million home. Specifically, in her calculation, Gauld first used the $158.63 per square foot selling price of a nearby home and multiplied this number by 4500 to get $713,835. She then multiplied the $305 per square foot list price of 106 E. Johnson by 4500 to get $1,372,500. By adding $713,835 to $1,372,500, she produced a sum of $2,086,335 which she divided by 4500. This division produced the number 231.81 which she multiplied by 4500 to derive $1,043,145. Gauld's analysis thus concludes with "a Fair Market Value of $1,043,145 for 102 Lucretia Lane **according to Chip Allen.**" (emphasis added). Gauld contends she has suffered diminution in value of $393,145, the difference between her expert's $650,000 appraisal and her "Fair Market Appraisal" of $1,043,145.

## STANDARD OF REVIEW

"On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to appellant, the non-moving party below." *Bergstrom v. Palmetto Health Alliance,* 358 S.C. 388, 395, 596 S.E.2d 42, 45 (2004) (citing *Williams v. Chesterfield Lumber Co.,* 267 S.C. 607, 230 S.E.2d 447 (1976)); *Koon v. Fares,* 379 S.C. 150, 155, 666 S.E.2d 230, 233 (2008); *Catawba Indian Tribe v. State,* 372 S.C. 519, 524, 642 S.E.2d 751, 753 (2007); *Platt v. CSX Transp., Inc.,* 379 S.C. 249, 255, 665 S.E.2d 631, 634 (Ct.App.2008). The appellate court will apply the same standard which governs the trial court under Rule 56(c), SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Connor Holdings, LLC v. Cousins,* 373 S.C. 81, 84, 644 S.E.2d 58, 60 (2007); *Pye v. Estate of Fox,* 369 S.C. 555, 633 S.E.2d 505 (2006); *Bradley v. Doe,* 374 S.C. 622, 649 S.E.2d 153 (Ct.App.2007), *cert. granted,* June 12, 2008; *see also Higgins v. Med. Univ. of S.C.,* 326 S.C. 592, 486 S.E.2d 269 (Ct.App.1997) (a trial judge considering a motion for summary judgment must consider all documents and evidence within the record, including pleadings, depositions, answers to interrogatories, admissions on file, and affidavits).

"If triable issues exist, those issues must go to the jury." *Miller v. Blumenthal Mills, Inc.,* 365 S.C. 204, 219, 616 S.E.2d 722, 729 (Ct.App.2005); *Mulherin–Howell v. Cobb,* 362 S.C. 588, 608 S.E.2d 587 (Ct.App.2005). In determining whether any triable issues of fact exist, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *Helms Realty, Inc. v. Gibson–Wall Co.,* 363 S.C. 334, 611 S.E.2d 485 (2005); *Med. Univ. of S.C. v. Arnaud,* 360 S.C. 615, 602 S.E.2d 747 (2004); *Hackworth v. Greenville County,* 371 S.C. 99, 637 S.E.2d 320 (Ct.App.2006); *Rife v. Hitachi Constr. Mach. Co.,* 363 S.C. 209, 609 S.E.2d 565 (Ct.App.2005).

"The purpose of summary judgment is to expedite the disposition of cases which do not require the services of a fact finder." *Hooper v. Ebenezer Senior Svcs. & Rehabilitation Ctr.,* 377 S.C. 217, 226–27, 659 S.E.2d 213, 217 (Ct.App. 2008) (citing *Dawkins v. Fields,* 354 S.C. 58, 69, 580 S.E.2d 433, 438 (2003)); *Moore v. Weinberg,* 373 S.C. 209, 217, 644 S.E.2d 740, 744 (Ct.App.2007); *Bennett v. Investors Title Ins. Co.,* 370 S.C. 578, 589, 635 S.E.2d 649, 654 (Ct.App.2006). Summary judgment is a drastic remedy and should be cautiously invoked to ensure a litigant is not improperly deprived of a trial on disputed factual issues. *Hooper,* 377 S.C. at 224, 659 S.E.2d at 217; *Helena Chem. Co. v. Allianz Underwriters Ins. Co.,* 357 S.C. 631, 644, 594 S.E.2d 455, 462 (2004); *B & B Liquors, Inc. v. O'Neil,* 361 S.C. 267, 270, 603 S.E.2d 629, 631 (Ct.App.2004). Summary judgment is inappropriate where further inquiry into the facts of the case is necessary to clarify the application of law. *Gadson v. Hembree,* 364 S.C. 316, 320, 613 S.E.2d 533, 535 (2005); *Wogan,* 366 S.C. at 591, 623 S.E.2d at 112; *Montgomery v. CSX Transp., Inc.,* 362 S.C. 529, 542, 608 S.E.2d 440, 447 (Ct.App.2004).

"The party seeking summary judgment has the burden of clearly establishing the absence of a genuine issue of material fact." *Wogan v. Kunze,* 366 S.C. 583, 591, 623 S.E.2d 107, 112 (Ct.App.2005) (citing *McCall v. State Farm Mut. Auto. Ins. Co.,* 359 S.C. 372, 597 S.E.2d 181 (Ct.App.2004)); *see also Singleton v. Sherer,* 377 S.C. 185, 197, 659 S.E.2d 196, 203 (Ct.App.2008). "Once the party moving for summary judgment meets the initial burden of showing an absence of evidentiary support for the opponent's case, the opponent

cannot simply rest on mere allegations or denials contained in the pleadings." Moore, 373 S.C. at 217, 644 S.E.2d at 744; *Regions Bank v. Schmauch,* 354 S.C. 648, 582 S.E.2d 432 (Ct.App.2003). The nonmoving party must present specific facts showing a genuine issue for trial. *SSI Med. Srvcs., Inc. v. Cox,* 301 S.C. 493, 497, 392 S.E.2d 789, 792 (1990); *Moore,* 373 S.C. at 217, 644 S.E.2d at 744; *Rife,* 363 S.C. at 214, 609 S.E.2d at 568.

" 'The plain language of Rule 56(c), SCRCP, mandates the entry of summary judgment, after adequate time for discovery against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial.' " *Boone v. Sunbelt Newspapers, Inc.,* 347 S.C. 571, 579, 556 S.E.2d 732, 736 (Ct.App.2001) (citing *Carolina Alliance for Fair Employment v. S.C. Dep't of Labor, Licensing, and Regulation,* 337 S.C. 476, 485, 523 S.E.2d 795, 800 (Ct.App.1999)); *Baughman v. AT & T,* 306 S.C. 101, 410 S.E.2d 537 (1991). "A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.*

## *LAW/ANALYSIS*

As a general rule, the evidence should allow the court or jury to determine the amount of damages with reasonable certainty or accuracy. *Whisenant v. James Island Corp.,* 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981); *Piggy Park Enters. v. Schofield,* 251 S.C. 385, 391–92, 162 S.E.2d 705, 708 (1968). "Neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation." *Piggy Park,* 251 S.C. at 391, 162 S.E.2d at 708; *Baughman,* 306 S.C. at 117, 410 S.E.2d at 546; *Gray v. Southern Facilities, Inc.,* 256 S.C. 558, 570–71, 183 S.E.2d 438, 444 (1971).

While proof, with mathematical certainty, of the amount of loss or damage is not required, in order for damages to be recoverable the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy. Neither the existence, causation nor amount of damages can be left to conjecture, guess, or speculation.

*Baughman,* 306 S.C. at 116, 410 S.E.2d at 546; *see also Whisenant,* 277 S.C. at 13, 281 S.E.2d at 796; *Armstrong v. Collins,* 366 S.C. 204, 225–26, 621 S.E.2d 368, 379 (Ct.App. 2005); *Proctor v. Dep't of Health & Envt'l Control,* 368 S.C. 279, 317, 628 S.E.2d 496, 516 (Ct.App.2006). " '[I]t had been held sufficient if a reasonable basis of computation is afforded, even though the result may be only approximate, or to adduce evidence which is the best the case is susceptible of under the circumstances and which will permit a reasonably close estimate of the loss.' " *Proctor,* 368 S.C. at 317, 628 S.E.2d at 517 (quoting 25A C.J.S. *Damages* § 162(2)).

██ "As a general principle, a landowner who is familiar with her property and its value, is allowed to give her estimate as to the value of the land and damage thereto, even though she is not an expert." *Bowers v. Bowers,* 349 S.C. 85, 92, 561 S.E.2d 610, 614 (Ct.App.2002) (citing *Seaboard Coast Line R.R. v. Harrelson,* 262 S.C. 43, 202 S.E.2d 4 (1974)); *see also Waites v. S.C. Windstorm & Hail Underwriting Assoc.,* 279 S.C. 362, 366, 307 S.E.2d 223, 225 (1983); *Lewis v. S.C. State Hwy. Dep't,* 278 S.C. 170, 173, 293 S.E.2d 434 (1982); *Whisenant* at *id.; S.C. State Highway Dep't v. Wilson,* 254 S.C. 360, 175 S.E.2d 391 (1970); *Hawkins v. Greenwood Dev. Corp.,* 328 S.C. 585, 493 S.E.2d 875 (Ct.App.1997); *Cooper v. Cooper,* 289 S.C. 377, 346 S.E.2d 326 (Ct.App.1986).

In *Rogers v. Rogers,* 280 S.C. 205, 311 S.E.2d 743 (Ct.App. 1984), this court ruled a property owner was competent to estimate his property's value as a matter of law. *Id.* at 209, 311 S.E.2d at 746. However:

Where it appears that the owner does not know the value of property, there is a division in the authorities. Some courts hold that his opinion as to value is not admissible, while others have concluded that such lack of knowledge goes to the weight, but not to the competency, of his testimony.

Any exception to the general rule of admissibility should be, and apparently has been, applied only in extreme cases. Unless the landowner's want of qualification is so complete that his testimony is entirely worthless, it is for the jury to assess the value of his opinion.

*Harrelson,* 262 S.C. at 46, 202 S.E.2d at 5 (citations omitted); *Mali v. Odom,* 295 S.C. 78, 83, 367 S.E.2d 166, 169 (Ct.App. 1988).

"Bald allegations of diminution in property value are insufficient to create a genuine issue of fact regarding damages absent any competent evidence showing the existence, amount, or causation of damages." *Clark v. Greenville County,* 313 S.C. 205, 208, 437 S.E.2d 117, 118 (1993) (citing *Baughman,* 306 S.C. 101, 410 S.E.2d 537). In *Baughman,* property owners alleged, *inter alia,* their property was damaged by pollution from a refinery. The plaintiffs simply asserted in their answers and depositions that pollution had caused diminution in their property values. In agreeing the evidence amounted to "bald allegations," our supreme court averred:

> There is a total absence of any competent evidence showing the existence or the amount of damage to property, or that any such damage was proximately caused by the acts of [respondents]. Accordingly, we affirm trial court's grant of partial summary judgment on Plaintiffs' claims for property damages.

*Id.* at 117, 410 S.E.2d at 546.

In an appeal from a Family Court decision, this court refused the wife's valuation of a marital home that she admitted was " 'a guesstimate based on just some conversation I had with Prudential Company. But, they would not, again, give me a firm answer.' " *Bowers,* 349 S.C. at 92, 561 S.E.2d at 614. Her value was determined to be based not on her personal knowledge regarding the home's true value but was "bottomed and premised entirely upon the unsupported and unsubstantiated advice of an unknown third party." *Id.* at 93, 561 S.E.2d at 614. Consequently, the wife's valuation was speculative and not supported by evidence.

In contrariety, a property owner's opinion of his commercial property was within the bounds of proper testimony when it was based on comparable land. *Hawkins v. Greenwood Development Corp.,* 328 S.C. 585, 493 S.E.2d 875 (Ct.App.1997). Hawkins initiated an action for breach of contract after an intersection that was to be located on his land was rendered impossible by road formation. He testified land at the corners

of a nearby major intersection sold for $450,000 per acre, thus the land on each corner of the proposed intersection on his property would be worth $2,000,000. *Id.* at 597, 493 S.E.2d at 881. Unlike Gauld, Hawkins "based his opinion on the damages sustained to his property on his knowledge of *similar* nearby parcels." *Id.* at 599, 493 S.E.2d at 882 (emphasis added). *See also Hill v. City of Hanahan,* 281 S.C. 527, 316 S.E.2d 681 (Ct.App.1984) (in inverse condemnation case, a property owner's testimony that she was knowledgeable about real property values in her neighborhood and believed her property to be worth $75,000 was admissible evidence).

Given Gauld's involvement with 102 Lucretia Lane and her experience in real estate, she is familiar with her property and competent to testify to its value. Nevertheless, she has offered a computation of diminution in value that is completely devoid of any rational basis. Although she argues she has "not pulled a random number out of the sky," she inexplicably anchored her proposed damages in part on the list price of dissimilar property raised by Allen in a context unrelated to either 102 Lucretia Lane or the parkway.

Gauld admitted both property values she relied upon to calculate diminution in value are based on homes which are not comparable to her own. Her reasoning that, because she considers 102 Lucretia Lane to be superior to one property and inferior to another, one can calculate her home's value without the parkway simply by manipulating the numbers and "split[ing] it down the middle" is absurdly speculative if not disingenuous. Despite her expert's admonition that he did not appraise the home considering the impact of the Phase III extension, Gauld insinuates his appraisal of $650,000 represented the home's value as affected by the prospective road. With her misplaced reliance on the sale and list prices of noncomparable properties, Gauld's attempt to avoid the appearance of making a "bald allegation" fails.

Viewing the evidence in a light most favorable to Gauld, all appraisals and offers received on 102 Lucretia Lane indicate the property appreciated after its purchase and refurbishing. There being nothing to take Gauld's diminution of value calculation out of the realm of pure conjecture, we hold the circuit court properly concluded there was no competent,

admissible evidence of the existence or amount of damages, an element common to all her claims. Accordingly, we need not address Gauld's remaining issues on appeal. *See Wilson v. Moseley,* 327 S.C. 144, 147, 488 S.E.2d 862, 864 (1997) (holding when an appellate court affirms the circuit court's grant of summary judgment on a dispositive ground, the appellate court need not address the remaining issues on appeal); *Fuller–Ahrens P'ship v. S.C. Dep't of Highways & Pub. Transp.,* 311 S.C. 177, 182, 427 S.E.2d 920, 923 (Ct.App.1993) (declining to discuss the circuit court's grant of summary judgment on additional grounds, including res judicata, where summary judgment was being affirmed for other reasons and on different grounds); *Ringer v. Graham,* 286 S.C. 14, 20, 331 S.E.2d 373, 377 (Ct.App.1985) (determining discussion of remaining issues was unnecessary after reversing a directed verdict).

## CONCLUSION

The circuit court's grant of summary judgment on all Gauld's claims is

**AFFIRMED.**

HUFF and THOMAS, JJ., concur.