Allen Smith Inv. Props., LLC v. Barbarry Props., LLC, 2013 NCBC 1.

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
|---|---|
| COUNTY OF MECKLENBURG | MASTER CASE FILE NO. 09 CVS 28709 |
| ALLEN SMITH INVESTMENT PROPERTIES, LLC, and THE HERMAN GROUP, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BARBARRY PROPERTIES, LLC, and BARRY WEINSTEIN,<br><br>Defendants. | **ORDER AND OPINION** |

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
|---|---|
| COUNTY OF MECKLENBURG | 09 CVS 20255 |
| ALLEN SMITH INVESTMENT PROPERTIES, LLC, and THE HERMAN GROUP, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BARBARRY PROPERTIES, LLC,<br><br>Defendant. | |

*James L. Blane, PLLC by James L. Blane; and C. Michael Wilson, Attorney at Law, PLLC by C. Michael Wilson for Plaintiffs.*

*Nelson Mullins Riley & Scarborough LLP by Thomas G. Hooper and Julia B. Hartley for Defendants.*

Murphy, Judge.

{1}     **THIS MATTER** is before the Court on Defendants Barbarry Properties, LLC ("Barbarry"), and Barry Weinstein's ("Weinstein") (collectively "Defendants") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of

Civil Procedure ("Motion I"), Motion to Strike Affidavit and For Sanctions ("Motion II"), and Motion for Leave to Amend and Supplement Motion for Summary Judgment ("Motion III"). After considering the parties' motions, briefs, affidavits, depositions, and arguments of counsel at the October 12, 2011, hearing, the Court **GRANTS** in part and **DENIES** in part Motion I, **GRANTS** in part and **DENIES** in part Motion II, and **DENIES** Motion III.

I.

PROCEDURAL HISTORY

{2}    On August 26, 2009, Plaintiffs Allen Smith Investment Properties, LLC ("ASIP"), The Herman Group, LLC ("Herman"), and James Allen Smith ("Smith") filed a Complaint in 09 CVS 20255 (the "First Action") asserting claims against Barbarry for breach of fiduciary duties, fraud and constructive fraud. On or about November 23, 2009, ASIP, Herman, and Smith filed a second Complaint in 09 CVS 28709 (the "Second Action") asserting claims for breach of fiduciary duty, fraud and constructive fraud against Barbarry, and for fraud and conversion against Weinstein.

{3}    The Second Action was designated a complex business case and assigned to this Court. In the interest of judicial economy, and to promote the ends of justice, both cases were consolidated by consent of the parties on January 6, 2010, under the case captioned 09 CVS 28709, which became the Master File.

{4}    On November 24, 2010, Smith voluntarily dismissed all of his claims against both Defendants.

{5}    On December 3, 2010, ASIP and Herman (collectively "Plaintiffs") filed an Amended and Restated Complaint and Motion for Preliminary Injunction against Defendants.

{6}    Pursuant to Rule 17.4 of the General Rules of Practice and Procedure for the North Carolina Business Court, the Court previously entered a Case Management Order ("CMO") on February 1, 2010, setting November 22, 2010, as the end date for discovery. (CMO at 3, Feb. 1, 2010.) After several extensions, the

Court ultimately set April 12, 2011, as the end date for discovery, and ordered that no further extensions would be granted. (Order Am. CMO, Feb. 11, 2011.)

{7}    On May 13, 2011, Defendants filed Motion I for Summary Judgment on the surviving claims: breach of fiduciary duty against Barbarry; fraud against Barbarry and Weinstein; and constructive fraud against Barbarry.

{8}    In response, on June 23, 2011, Plaintiffs filed their Brief in Opposition to Defendants' Motion for Summary Judgment, attaching a sworn affidavit from Smith.

{9}    On July 11, 2011, Defendants filed their Motion II moving to strike Paragraphs 5 and 6 of Smith's affidavit and for sanctions.

{10}   On October 12, 2011, the Court conducted a hearing on Defendants' Motions I and II.

{11}   On October 1, 2012, Defendants filed their Motion III to amend and supplement their motion for summary judgment.

II.

FACTUAL BACKGROUND

A.

FACTS CONSIDERED IN DETERMINING MOTION I

{12}   On a motion for summary judgment under Rule 56 of the North Carolina Rules of Civil Procedure, the Court does not make findings of fact to resolve an issue of material fact. "[S]ummary judgment presupposes that there are no triable issues of material fact." *Hyde Ins. Agency v. Dixie Leasing*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975). Therefore, the Court recites only those material facts that the Court concludes are not disputed, and which justify entering judgment. *Id.*

{13}   ASIP is a North Carolina limited liability company owned and managed by Smith. (Am. Compl. ¶ 1; Smith Aff. ¶ 1, Jan. 29, 2010.)

{14}   Herman is a New York limited liability company managed by Samuel L. Savarino ("Savarino"). (Am. Compl. ¶ 2; Savarino Aff. ¶ 1.)

{15}   Weinstein is a principal member of Barbarry, a Delaware limited liability company located in New York. (Weinstein Aff. ¶ 4, Feb. 16, 2010; Am. Compl. ¶ 3.)

{16}  In or around 1998, Plaintiffs formed a partnership to develop approximately 22 acres in Crowfield Plantation, Goosecreek, South Carolina into an apartment community ("Coventry Green").  (Am. Compl. ¶ 5.)

{17}  In approximately September 1999, Plaintiffs invited Barbarry to become a partner in a new limited partnership – Herman-Coventry Green, LP (the "Partnership") – created to develop Coventry Green.  (Am. Compl. ¶ 5.)

{18}  The Third Amended and Restated Limited Partnership Agreement (the "Partnership Agreement") designates Barbarry, Herman and ASIP as General Partners in the Partnership with Barbarry acting as Managing General Partner, and names Weinstein and Smith as Limited Partners.  (Weinstein Aff. Ex. 1 § 7.2, Feb. 16, 2010.)  The Partnership Agreement further designates the laws of the state of South Carolina as the applicable law governing the terms of the agreement.  (Weinstein Aff. Ex. 1 § 20.5, Feb. 16, 2010.)

{19}  On August 1, 2005, in its role as Managing General Partner, Barbarry entered into an agreement on behalf of the Partnership with InterMark Management Corporation ("InterMark"), a property management company.  (Stuckey Aff. ¶ 5, Ex. A.)  Under the agreement, InterMark was obligated to manage Coventry Green, including leasing the apartments and making necessary repairs.  (Stuckey Aff. ¶ 5, Ex. A; Weinstein Aff. ¶¶ 23–25, Feb. 16, 2010.)  As a result, Barbarry did not handle the day-to-day maintenance and repair issues of Coventry Green.  (Weinstein Aff. ¶ 25, Feb. 16, 2010.)

{20}  Barbarry also agreed that InterMark had the authority to defer some maintenance based on the recommendations of InterMark management personnel.  (Weinstein Aff. ¶ 25, Feb. 16, 2010.)

{21}  To assure the availability of financing, the Partnership budgeted for certain repairs each year.  (Smith Dep. 119:16–17, Nov. 10, 2010.)  In 2009, some of the repairs that had been budgeted for and scheduled were not completed.  (Smith Aff. ¶ 9, Jan. 29, 2010.)

{22}  On January 28, 2010, Plaintiffs' witness, Glenn P. Kropilak, detailed in a Property Condition Report the various deficiencies found on the apartment complex

property, and estimated the cost of repairs for the deferred maintenance to be in excess of $90,000.  (Kropilak Aff. ¶ 7.)  However, as of July 19, 2010, all deferred items were repaired or scheduled for repair within weeks at a total cost of $61,353.61, a difference of $28,646.39 from cost estimates.  (Zdunczyk Aff. ¶ 3, July 19, 2010; Stuckey Aff. ¶ 10.)

{23}  Plaintiffs allege that the deferred maintenance resulted in lost profits. (Pls.' Br. Opp. Mot. Summ. J. 7–8.)  Smith, on behalf of ASIP, asserts that the Partnership is still trying to figure out how to quantify losses to get a "pretty good idea of what the impact of all of this has been," and it does not anticipate being able to calculate the loss in profits until "[t]he day before the trial."  (Smith Dep. 122:22, Nov. 10, 2010.)

{24}  Smith further points out that a December 31, 2009, Competitive Market Survey (the "Survey"), prepared by Intermark, stated that Coventry Green's occupancy rates would be 12%–18% below the rates of other properties in the area. (Smith Aff. ¶ 10, Jan. 29, 2010; Stuckey Aff. ¶¶ 11–12.)  According to Smith, this disparity amounts to a difference in income of $316,506 to $474,759 a year.  (Smith Aff. ¶ 10, Jan. 29, 2010.)  However, Smith goes on to say that the overall damage to the Partnership would be "impossible to quantify."  (Smith Aff. ¶ 13, Jan. 29, 2010.)

{25}  Both Smith, on behalf of ASIP, and Savarino, on behalf of Herman, gave deposition testimony that the lower occupancy rate would be only one consideration in accounting for lost profits, and that they could not provide a calculation for damages without considering many other factors.  (Smith Dep. 144:6–23, Nov. 10, 2010; Savarino Dep. 109:7–110:13, Nov. 12, 2010.)  Neither could provide a complete list of the factors requiring consideration.  Moreover, Savarino agreed that "[t]here's a number of factors to be considered . . .," and acknowledged that he did not know if he could quantify the loss.  (Savarino Dep. 109:7–8, 110:13, Nov. 12, 2010.)

{26}  In addition to the deferred maintenance, Plaintiffs also take issue with Defendants' use of Apartment 1111 at Coventry Green and the withdrawal of funds from the Partnership account.  (*See* Am. Compl.)

{27}   Apartment 1111 is a three bedroom apartment at Coventry Green (Am. Compl. ¶ 19) that Barbarry used on occasion. (Am. Compl. ¶ 23; Answer ¶ 23.) Weinstein, on behalf of Barbarry, stated that Barbarry only used Apartment 1111 in connection with Partnership business, including overseeing construction and inspections and participating in a Partnership related arbitration. (Weinstein Aff. ¶¶ 26–27, Feb. 16, 2010.)

{28}   According to Smith, in October 2009, he attempted to enter Apartment 1111 but found the locks had been changed. (Smith Aff. ¶ 12, Jan. 29, 2010.) Intermark instructed Smith to contact Weinstein for access to the apartment. (Smith Aff. ¶ 12, Jan. 29, 2010.) However, Weinstein denies that Smith ever contacted him about staying at Apartment 1111 or asked for a new key, which Smith does not refute. (Weinstein Aff. ¶¶ 29–31, Feb. 16, 2010.) Furthermore, Weinstein clarified that Intermark did not change the locks on the apartment at his request. (Weinstein Aff. ¶ 31, Feb. 16, 2010.) Smith later stated that he heard from the property manager that Weinstein told them not to allow the other partners to use Apartment 1111. (Smith Aff. ¶ 7, June 23, 2011.)

{29}   On or about February 27, 2009, Barbarry, through Weinstein, asked that Barbarry be paid an administrative fee equal to one percent of gross profits each month, but the Partnership refused to pay such a fee. (Am. Compl. ¶ 7; Smith Aff. ¶ 3, Jan. 29, 2010; Weinstein Aff. ¶ 18, Feb. 16, 2010.)

{30}   Thereafter, in April 2009, Barbarry claimed a reimbursement from the Partnership for expenses totaling $11,207.65. (Smith Aff. ¶ 4, Jan. 29, 2010; Weinstein Aff. ¶ 19, Feb. 16, 2010.) Under the Partnership Agreement, the Managing General Partner (Barbarry) was authorized to recover all expenses incurred while acting on behalf of the Partnership. (Weinstein Aff. Ex. 1 § 7.2, Feb. 16, 2010.)

{31}   After discovering the withdrawal, Smith claims he contacted Weinstein to have him explain the purpose of the withdrawal. (Smith Aff. ¶ 5, Jan. 29, 2010.) Weinstein responded that the withdrawal covered reimbursement of expenses incurred by Barbarry while acting on behalf of the Partnership. (Smith Aff. ¶ 5,

Jan. 29, 2010.)  Plaintiffs suspected, however, that the withdrawal represented an impermissible administrative fee and demanded verification for the claimed expenses, which Smith claims Defendants never produced.  (Smith Aff. ¶¶ 4–7, Jan. 29, 2010.)

{32}  Smith had his attorney write a letter to Mark Stuckey ("Stuckey"), President of InterMark, informing Stuckey that the transfer of funds to Barbarry had not been approved by all the General Partners, and instructing Stuckey to cease making any further payments to Barbarry without approval of 51% of the partners.  (Smith Aff. ¶ 6, Feb. 23, 2010.)

{33}  Despite this directive, in November 2009, InterMark informed Smith that Barbarry, through Weinstein, continued to withdraw "expenses" totaling $2,150.00 a month from May 2009 to November 2009, but never provided an expense report. (Smith Aff. ¶¶ 6–7, Jan. 29, 2010.)  Defendants assert that Barbarry only withdrew valid expenses.  (Weinstein Aff. ¶ 19, Feb. 16, 2010.)

B.

ADDITIONAL FACTS CONSIDERED IN RESOLUTION OF MOTION II

{34}  In the affidavit submitted with Plaintiffs' brief opposing summary judgment, Smith attempts to outline a calculation of damages.  (Smith Aff. ¶ 6, June 23, 2011.)

{35}  In Paragraph 5, Smith states that he is a real estate broker with expert knowledge of the Charleston apartment market.  (Smith Aff. ¶ 5, June 23, 2011.)

{36}  In Paragraph 6, Smith relies on the Survey and 2010 income levels to calculate damages from lost profits allegedly caused by deferred maintenance at Coventry Green based on the disparity in occupancy rates between Coventry Green and nearby properties.  (Smith Aff. ¶ 6, June 23, 2011.)

III.

ANALYSIS

A.

MOTION I

1.

STANDARD OF REVIEW

{37}   "The purpose of summary judgment is to determine whether any issues of material fact exist, and if not, eliminate the necessity of a full trial where only questions of law are involved." *Strickland v. Lawrence*, 176 N.C. App. 656, 661, 627 S.E.2d 301, 305 (2006) (citing *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 641–42, 281 S.E.2d 36, 40 (1981)).  Thus, the Court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C. R. Civ. P. 56(c).

{38}   "The movant has the burden of establishing the absence of any triable issues of fact." *Strickland*, 176 N.C. App. at 661, 627 S.E.2d at 305.  This burden can be met in one of two ways:  "(1) 'by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense'; or (2) 'by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim.'" *Id.* (quoting *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)).

{39}   In ruling on a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party. *See Wilmington Star-News v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 178, 480 S.E.2d 53, 55 (1997) (citation omitted).

2.

BREACH OF FIDUCIARY DUTY AGAINST BARBARRY

{40}   Under South Carolina law, "[t]o establish a claim for breach of fiduciary duty, the plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of

that duty owed to the plaintiff by the defendant, and (3) damages proximately resulting from the wrongful conduct of the defendant." *RFT Mgmt. Co., LLC v. Tinsley & Adams LLP*, 399 S.C. 322, 335–36, 732 S.E.2d 166, 173, *reh'g denied*, 2012 S.C. LEXIS 193 (2012) (citing *Moore v. Moore*, 360 S.C. 241, 599 S.E.2d 467 (Ct. App. 2004)).[1]

{41}   While Barbarry does not dispute that it owes a fiduciary duty to Plaintiffs (Am. Compl. ¶ 26; Answer ¶ 26), Barbarry contends that Plaintiffs have failed to present a genuine issue of material fact to support Plaintiffs' claim (a) for breach of the fiduciary duty or damages arising from the alleged improper use of partnership property; and (b) for damages from the deferral of certain maintenance and repair projects.[2]

a.

BARBARRY'S USE OF PARTNERSHIP PROPERTY

{42}   Under the South Carolina Uniform Limited Partnership Act ("ULPA"), "a general partner of a limited partnership has the rights and powers . . . of a partner in a partnership without limited partners," unless the ULPA or the partnership agreement states otherwise.  S.C. CODE ANN. § 33-42-630(a) (2012).  Here, neither the Partnership Agreement nor the ULPA declares the General Partners' rights to partnership property.  (*See* Weinstein Aff. Ex. 1, Feb. 16, 2010.)  Thus, because Barbarry is a general partner in the Partnership, the Court looks to the South Carolina Uniform Partnership Act ("UPA") for guidance.  Under the UPA, "[a] partner is a co-owner with his partners of specific partnership property, holding the partnership property as a tenant in partnership."  S.C. CODE ANN. § 33-41-720(1)

---

[1] The parties do not dispute that South Carolina law governs all substantive issues before the Court and that North Carolina law governs all procedural matters.  (Pls.' Br. Opp. Mot. Summ. J. 1; Defs.' Br. Supp. Mot. Summ. J. 7.)

[2] Plaintiffs also claim that Barbarry breached its fiduciary duty by improperly removing partnership funds.  However, Defendants acknowledge the existence of conflicting testimony on this issue, and therefore, do not seek summary judgment for breach of fiduciary duty based on the alleged removal of partnership funds.  (Defs.' Br. Supp. Mot. Summ. J. 9.)

(2012).  Accordingly, "a partner . . . has an equal right with his partners to possess specific partnership property for partnership purposes . . . ."  § 33-41-720(2)(a).

{43}  Plaintiffs argue that Barbarry's use of Apartment 1111 constituted a breach of fiduciary duty because it excluded other partners from the apartment and precluded it from being available as a rental unit, thus depriving the Partnership of income.  (Am. Compl. ¶¶ 20, 22.)  Barbarry asserts that it is entitled to use and possess Apartment 1111 for partnership purposes because Coventry Green is partnership property.  Weinstein provided an affidavit wherein he admits that Barbarry used Apartment 1111 on occasion, but asserts that Barbarry only used the location in connection with partnership business, including overseeing construction and inspections and participating in a Partnership related arbitration.  (Weinstein Aff. ¶ 26, Feb. 16, 2010.)  Plaintiffs do not allege any facts or present any evidence to dispute Barbarry's use of the property for partnership business.  Therefore, there is no genuine issue as to whether Barbarry acted within its rights as a General Partner in the Partnership.

{44}  Although Smith argues that he could not access Apartment 1111 after the locks were changed (Smith Aff. ¶ 12, Jan. 29, 2010), Plaintiffs present no evidence that either of them ever asked Weinstein for access and was denied.  In fact, Weinstein asserts that Smith never contacted him about staying at Apartment 1111, and that Barbarry had no involvement in the decision to change the locks.  (Weinstein Aff. ¶¶ 29–31, Feb. 16, 2010.)  Smith did not put forth any facts to dispute Barbarry's assertions or to support its allegation that Barbarry excluded other partners from using Apartment 1111.  Even Smith's assertion that he heard from the property manager that Weinstein told them not to allow the other partners to use Apartment 1111 is unsupported by any evidence that Plaintiffs were subsequently excluded from the property or that Weinstein actively prevented them from using the property.  (Smith Aff. ¶ 7, June, 23, 2011.)

{45}  If Barbarry had an equal right with its partners to possess the property for partnership purposes, as provided for by S.C. Code Ann. § 33-41-720(2)(a), and acted accordingly, Plaintiffs' unsupported assertion that Barbarry's use excluded

other partners from Apartment 1111 and precluded Apartment 1111 from being available as a rental unit, depriving the Partnership of income, avails them nothing. Therefore, because there remains no issue of material fact regarding breach, the Court concludes that Barbarry has met its burden of demonstrating Plaintiffs' failure on an essential element of their claim for breach of fiduciary duty based on Barbarry's alleged improper use of partnership property.[3]

{46}   Accordingly, the Court **GRANTS** Motion I as to Plaintiffs' claim for breach of fiduciary duty by improper use of partnership property, and hereby **DISMISSES** with prejudice this aspect of Plaintiffs' claim for breach of fiduciary duty.

b.

BARBARRY'S DEFERRAL OF MAINTENANCE

{47}   Restated, to establish breach of fiduciary duty, the plaintiff must show "damages proximately resulting from the wrongful conduct of the defendant." *RFT Mgmt. Co.*, 399 S.C. at 336, 732 S.E.2d at 173.  Thus, where a plaintiff seeks damages based on lost profits, as is the case here, the plaintiff must demonstrate that the profits lost were a natural consequence of the breach.  *Drews Co., Inc. v. Ledwith-Wolfe Assoc., Inc.*, 296 S.C. 207, 213, 371 S.E.2d 532, 535 (1988) (citation omitted).

{48}   To survive summary judgment, "the evidence should allow the court or jury to determine the amount of damages with reasonable certainty or accuracy." *Gauld v. O'Shaugnessy Realty Co.*, 380 S.C. 548, 559, 671 S.E.2d 79, 85 (Ct. App. 2008) (affirming summary judgment for defendants based on plaintiff's failure to produce sufficient evidence of damages) (citations omitted).  "Neither the existence, causation, nor amount of damages can be left to conjecture, guess, or speculation." *Id.* at 559, 671 S.E.2d at 85–86 (citations omitted).  "The law does not require absolute certainty of data upon which lost profits are to be estimated, . . . , and it is sufficient if there is a certain standard or fixed method by which profits sought to be recovered may be estimated and determined with a fair degree of accuracy." *Petty*

---

[3] Having held there was no breach of fiduciary duty, the Court does not reach Defendant Barbarry's argument that Plaintiffs failed to adequately prove damages.

*v. Weyerhauser Co.*, 288 S.C. 349, 355, 342 S.E.2d 611, 615 (Ct. App. 1986) (quotation and citation omitted). "The proof . . . must consist of actual facts from which a reasonably accurate conclusion regarding the cause and the amount of the loss can be logically and rationally drawn." *Drews*, 296 S.C. at 213, 371 S.E.2d at 536 (citing 22 AM. JUR. 2d *Damages* § 641 (1988)).

{49} Lost profits "may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses," *Drews*, 296 S.C. at 214, 371 S.E.2d at 536 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 352, at 146 (1981)), but must be diminished by the costs which would have been incurred in earning such profits. *Id.* at 210, 371 S.E.2d at 534 (citing RESTATEMENT (SECOND) OF CONTRACTS § 331, Comment B (1932); *Mali v. Odom*, 295 S.C. 78, 367 S.E.2d 166 (Ct. App. 1988)). In *Drews*, the court held, as a matter of law, that proof of damages was insufficient to submit to a jury because the complaining party only put forth evidence of gross profits without any figures for operating expenses averted or a standard for establishing net profits. 296 S.C. at 214, 371 S.E.2d at 536.

{50} Furthermore, in *Mali*, the court ruled that estimates of monthly income and expenses were speculative when offered "without reference to any operational history . . . or to any particular standard or fixed method . . . ." 295 S.C. at 84, 367 S.E.2d at 170. The court in *Mali* noted that a three-month operating history from before the breach or harm occurred, accompanied by a certain standard or method to estimate lost profits, had previously been found sufficient to afford a reasonable basis for determining lost profits. *Id.* (citing *Petty*, 288 S.C. at 356–57, 342 S.E.2d at 615–16.) Without these facts, the court would be left to speculate about the amount and causation of lost profits. Thus, where a plaintiff fails to provide such proof of lost profits, the Court may rule as a matter of law on the issue of damages.

{51} Here, Plaintiffs allege Barbarry breached the fiduciary duty owed to the Partnership when it deferred certain maintenance and repair projects at Coventry

Green, resulting in lost profits.[4]  (Pls.' Br. Opp. Mot. Summ. J. 7–8.)  However, Barbarry argues that Plaintiffs failed to offer adequate proof of damages.

{52}   In his initial affidavit, Smith, on behalf of ASIP, pointed out that Intermark's Survey projected that Coventry Green's occupancy rates would be 12%–18% below other properties in the area, amounting to a difference of $316,000 to $475,000 in income.  (Smith Aff. ¶ 10, Jan. 29, 2010.)  However, in that same affidavit, Smith stated that the overall damage would be "impossible to quantify." (Smith Aff. ¶ 13, Jan. 29, 2010.)  When asked how Plaintiffs planned to calculate damages, Smith later testified that he would not be able to quantify or know the full impact on the Partnership until "[t]he day before trial."  (Smith Dep. 122:22, Nov. 10, 2010.)  Specifically, Smith asserted that Plaintiffs planned to look at a number of factors that could contribute to the Partnership's loss in profits, and that lower occupancy rates constituted only one consideration.  (Smith Dep. 144:6–23, Nov. 10, 2010.)  However, Smith could not provide a list of all the considerations Plaintiffs intended to rely on in calculating lost profits.  (Smith Dep. 144:6–23, Nov. 10, 2010.) Savarino, on behalf of Herman, reiterated these statements in his own deposition, stating that "[t]here's a number of factors to be considered . . ." and that he did not know if he could quantify the loss to the Partnership.  (Savarino Dep. 109:7–110:13, Nov. 12, 2010.)

{53}   Although Plaintiffs supplied a projected occupancy rate below comparable properties, they, much like the party in *Drews*, failed to account for any operating costs that a lower occupancy rate saved them or provide a method of calculation to equate the loss in income with a loss in profits.  While a strict mathematical calculation is not necessary, Plaintiffs must provide the Court with some method of

---

[4] The Court notes that Plaintiffs do not argue for any measure of damages beyond lost profits, nor do they put forth any evidence to support any other measure of damages.  (Pls.' Br. Opp. Mot. Summ. J. 5.)  Indeed, since all the deferred items have been completed at a lower than estimated cost (Zdunczyk Aff. ¶ 3, Feb. 16, 2010; Stuckey Aff. ¶ 10), Plaintiffs have not argued for relief based on increased costs. Therefore, although a party pursuing a breach of fiduciary duty claim may seek damages beyond lost profits, *see Moore v. Moore*, 360 S.C. 241, 256–57, 599 S.E.2d 467, 475 (Ct. App. 2004), Plaintiffs here do not put forth any arguments or evidence from which the Court could ascertain another measure of damages to withstand summary judgment.

calculation and with sufficient information to determine damages with a fair degree of accuracy.

{54} In addition, as in *Mali*, Plaintiffs did not present any facts that would advance the issue of causation beyond mere conjecture. Specifically, Plaintiffs allege that the maintenance deferrals began in 2009. (Smith Aff. ¶ 9, Jan. 29, 2010.) However, neither party submitted any operating data from before 2009 that could show a correlation between the maintenance deferrals and any drop in profits. Also, Plaintiffs never asserted that any specific tenant left Coventry Green or decided not to rent there because of concerns related to the deferral of maintenance. Without such data or other information showing causation or the amount of lost profits, the Court cannot conclude that Plaintiffs' claim that the deferral of maintenance caused a loss of profits is anything more than mere speculation.

{55} Although the parties conducted discovery for over a year, Plaintiffs could not provide sufficient evidence for the Court to determine the causation or amount of damages with reasonable certainty. Therefore, the Court concludes that Barbarry has met its burden of demonstrating Plaintiffs' failure to provide adequate proof of damages to support their breach of fiduciary duty claim.

{56} Accordingly, the Court **GRANTS** Defendant Barbarry's Motion for Summary Judgment as to Plaintiffs' claim for breach of fiduciary duty based on the deferral of maintenance. The Court, therefore, **DISMISSES**, with prejudice, Plaintiffs' claim for breach of fiduciary duty based on the deferral of maintenance and repair projects.

3.

FRAUD AGAINST BARBARRY AND WEINSTEIN

{57} Under South Carolina law, "the [Plaintiffs], in order to state a good cause of action [for fraud] *must allege* (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) his intent that it should be acted upon by the person; (6) [Plaintiffs'] ignorance of its falsity; (7) [Plaintiffs'] reliance on its truth; (8) [Plaintiffs'] right to rely thereon; and (9) [Plaintiffs'] consequent and proximate injury. *Mut. Sav. & Loan Assoc. v. McKenzie*, 274 S.C.

630, 633, 266 S.E.2d 423, 425 (1980) (alteration original) (citations omitted). "Each and every one of these elements must be proven by clear, cogent, and convincing evidence." *Regions Bank v. Schmauch*, 354 S.C. 648, 672, 582 S.E.2d 432, 445 (Ct. App. 2003).

{58} Plaintiffs argue that Defendants Barbarry and Weinstein committed fraud when Defendants misrepresented the purpose of certain withdrawals from the Partnership account. (Am. Compl. ¶¶ 30–35.) Specifically, Plaintiffs assert that Defendants' "expenses," in actuality, represented unauthorized administrative fees. Defendants deny that any false representation was ever made to Plaintiffs or that Plaintiffs relied on any such representations. (Defs.' Br. Supp. Mot. Summ. J. 20–26.)

{59} Defendants first argue that they never made any representations to Plaintiffs. Black's Law Dictionary defines a representation as "[a] presentation of fact – either by words or by conduct – made to induce someone to act." BLACK'S LAW DICTIONARY 1327 (8th ed. 2004).

{60} Here, Plaintiffs state that they did not know about or authorize the initial withdrawal of $11,207.65 in April 2009. (Smith Aff. ¶ 4, Jan. 29, 2010; Weinstein Aff. ¶ 19, Feb. 16, 2010.) Given that, it would be incongruous for Plaintiffs to simultaneously argue that Defendants made a representation of fact, by words or by conduct, to induce Plaintiffs to authorize the withdrawal. Thus, Plaintiffs cannot prove an essential element of their claim. The Court, therefore, concludes that the claim for fraud fails based upon the initial withdrawal in April 2009.

{61} However, after the April 2009 withdrawal, Plaintiffs claim that Weinstein responded to direct questioning about the withdrawal's purpose and stated that the withdrawal was for business expenses. (Smith Aff. ¶ 5, Jan. 29, 2010.) According to Plaintiffs, Defendants continued to withdraw a monthly amount from May 2009 until November 2009, despite failing to provide requested documentation to support the claimed expenses. (Smith Aff. ¶¶ 6–7, Jan. 29, 2010; Smith Aff. ¶ 6, Feb. 23, 2010.) This testimony, viewed in a light most favorable to Plaintiffs, presents a question of fact as to whether Defendants' conduct and assertions after the initial

withdrawal were representations that the May 2009 to November 2009 withdrawals were for reimbursements of valid business expenses. Given this evidence, the Court concludes that a factual dispute remains at issue regarding whether Defendants made a false representation regarding the May 2009 to November 2009 withdrawals. For that reason, summary judgment premised on this argument is inappropriate.

{62} Defendants next argue that, even if they made a representation for the withdrawals, Plaintiffs did not rely and could not have relied on any alleged misrepresentation, given Plaintiffs' suspicions after the April 2009 withdrawal.

{63} "Whether reliance is justified in a given situation requires an evaluation of the circumstances involved, including the position and relations of the parties." *Elders v. Parker*, 286 S.C. 228, 233, 332 S.E.2d 563, 567 (Ct. App. 1985). As a result, "[t]he general rule is that questions concerning reliance and its reasonableness are factual questions for the jury." *Redwind L.P. v. Edwards*, 354 S.C. 459, 475, 581 S.E.2d 496, 504 (Ct. App. 2003) (quoting *Unlimited Servs., Inc. v. Macklen Enters., Inc.*, 303 S.C. 384, 387, 401 S.E.2d 153, 155 (1991)).

{64} Although Plaintiffs state that they questioned the true purpose of the initial withdrawal and did not believe it reimbursed valid expenses (Smith Aff. ¶ 6, Feb. 23, 2010), Plaintiffs also assert that they demanded verification for the claimed expenses. (Smith Aff. ¶¶ 5–7, Jan. 29, 2010.) And, until they received a breakdown of the claimed expenses for approval, Plaintiffs argue that they had to rely on Defendants' response regarding the purpose of the withdrawals. (Am. Compl. ¶ 11.) The Court concludes that whether Plaintiffs were justified in their reliance, based on the relationship and positions of the parties involved, is a factual question that is inappropriate for determination at summary judgment.

{65} Accordingly, the Court **DENIES** Motion I as to Plaintiffs' claim for fraud based on the withdrawals from May 2009 to November 2009 and **GRANTS** Motion I as to Plaintiffs' claim for fraud based on the April 2009 withdrawal. The Court, therefore, **DISMISSES** with prejudice Plaintiffs' claim for fraud based on the April 2009 withdrawal.

4.

CONSTRUCTIVE FRAUD AGAINST BARBARRY

{66}  To establish a claim for constructive fraud, the plaintiff must prove the existence of a fiduciary relationship along with all the elements for fraud, except the element of intent. *Pitts v. Jackson Nat'l Life Ins. Co.*, 352 S.C. 319, 333, 574 S.E.2d 502, 509 (Ct. App. 2002) (quoting *Ardis v. Cox*, 314 S.C. 512, 515, 431 S.E.2d 267, 269 (Ct. App. 1993)).

{67}  Restated, it is undisputed that Barbarry owes a fiduciary duty to the Plaintiffs.  Having concluded above that a factual dispute remains at issue regarding Plaintiffs' claim of fraudulent withdrawals from the Partnership account between May 2009 and November 2009, Motion I likewise fails as to Plaintiffs' claim for constructive fraud based on these same withdrawals.  However, the Court also concluded above that Defendants did not make a representation as to the withdrawal in April 2009, which similarly defeats Plaintiffs' claim for constructive fraud against Barbarry based on that withdrawal.

{68}  Accordingly, the Court **DENIES** Motion I as to Plaintiffs' claim for constructive fraud based on the withdrawals from May 2009 to November 2009 and **GRANTS** Motion I as to Plaintiffs' claim for constructive fraud based on the April 2009 withdrawal.  The Court, therefore, **DISMISSES** with prejudice Plaintiffs' claim for constructive fraud based on the April 2009 withdrawal.

B.

MOTION II

{69}  Under Rule 37(b)(2) of the North Carolina Rules of Civil Procedure, if a party fails to comply with Rule 26(e) or a court order directing discovery, the Court has broad discretion to impose sanctions, including prohibiting the introduction of matters in evidence.  N.C. R. Civ. P. 37(b)(2); *Willoughby v. Wilkins*, 65 N.C. App. 626, 643, 310 S.E.2d 90, 101 (1983).  Rule 26(e) requires that the parties seasonably supplement their responses during discovery when they obtain new information which either reveals that the response was incorrect when made or is no longer correct.  N.C. R. Civ. P. 26(e).  "[T]he purpose behind Rule 26(e) is to prevent a party

with discoverable information from making untimely, evasive, or incomplete responses to requests for discovery." *Bumgarner v. Reneau*, 332 N.C. 624, 630, 422 S.E.2d 686, 689 (1992).

{70} In this case, the original CMO ordered that all discovery be completed by November 22, 2010. (CMO at 3, Feb. 1, 2010.) After granting several extensions on the discovery deadlines outlined in the CMO and refusing to grant any further extensions, the Court ordered the parties to complete all discovery by April 12, 2011. (Order Am. CMO, Feb. 11, 2011.)

{71} Throughout the discovery period, Plaintiffs made numerous responses to direct questioning and submitted affidavits stating that they did not know what the full extent of the damages would be from the deferral of maintenance or how to quantify lost profits. (*See* Smith Aff. ¶ 13, Jan. 29, 2010; Smith Dep. 122:22, 144:6–23, Nov. 10, 2010; Savarino Dep. 109:7–110:13, Nov. 12, 2010.) Plaintiffs claimed that any number of factors would have to be considered, and that they did not anticipate being able to quantify lost profits until the day before trial. (Smith Dep. 122:22, 144:6–23, Nov. 10, 2010; Savarino Dep. 109:7–110:13, Nov. 12, 2010.)

{72} Subsequently, and in spite of the Court-ordered deadline, Plaintiffs submitted the affidavit at issue on June 23, 2011, attempting to present a calculation for lost profits more than two months after discovery ended. (*See* Smith Aff., June 23, 2011.) In Paragraphs 5 and 6 of the new affidavit, Smith claims to be an expert in real estate in the area and provides a more definite calculation of damages.[5] (Smith Aff. ¶¶ 5–6, June 23, 2011.)

{73} With regard to Paragraph 5, Defendants argue that Plaintiffs attempted to qualify Smith as an expert witness also in violation of the CMO deadlines. The Business Court Rules specifically require that "[d]iscovery with respect to experts . . . be conducted within the discovery period set forth in the [CMO]." BCR 18.5. However, Plaintiffs state that they are not attempting to qualify Smith as an

---

[5] The Court notes that Defendants only move to have paragraphs 5 and 6 of the disputed Smith affidavit stricken from evidence. Therefore, the Court will not address the propriety of the remaining portions of the affidavit.

expert, and that all the testimony provided in the affidavit is based on Smith's personal knowledge. (Pls.' Br. Opp. Mot. Strike 15.) In the exercise of its discretion, the Court declines to strike Paragraph 5 based upon Defendants' argument that Plaintiffs attempt, therein, to qualify Smith as an expert witness.

{74} In Paragraph 6, Smith relies on income levels in 2010 and the Survey that he attached to his initial affidavit on January 29, 2010, to calculate lost profits from the deferral of maintenance. (Smith Aff. Ex. F, Jan. 29, 2010.) However, Plaintiffs had all the information used to make the calculation early in discovery but failed to supplement their previous incomplete responses. Indeed, Plaintiffs submitted the Survey into evidence over a year before discovery ended, and both parties referred to the Survey throughout discovery. (Stuckey Aff. ¶¶ 11–12; Kropilak Aff. ¶ 6; Smith Aff. ¶ 10, Jan. 29, 2010; Smith Aff. ¶ 2, Feb. 23, 2010.) In addition, Plaintiffs gave no explanation for why they could not provide the damages calculation within the ordered discovery period. Such conduct goes directly against the purpose of Rule 26(e) in preventing "untimely, evasive, and incomplete responses." Therefore, to the extent that Plaintiffs sought to introduce new evidence for lost profits with the submission of Paragraph 6 of the affidavit, the Court concludes that Plaintiffs violated the amended CMO and failed to seasonably supplement previous responses in discovery, warranting sanctions under Rule 37. Consequently, the Court, in the exercise of its discretion, strikes Paragraph 6 from the affidavit and will not consider it for purposes related to Motion I.[6]

{75} Accordingly, the Court hereby **GRANTS** in part and **DENIES** in part Motion II to Strike Affidavit and for Sanctions. The Court, in the exercise of its discretion, **STRIKES** Paragraph 6 from the Affidavit of James Allen Smith dated June 23, 2011.

---

[6] Given the Court's conclusion under Rule 37, it need not address Defendants' remaining arguments for striking portions of the affidavit under Rule 56.

C.

MOTION III

{76} Having considered Motion III and the parties' briefs, the Court concludes that good cause does not exist to allow Defendants to amend and supplement their motion and briefs seeking summary judgment. Accordingly, the Court hereby **DENIES** Motion III for Leave to Amend and Supplement Defendants' Motion for Summary Judgment.

IV.

CONCLUSION

{77} For the reasons stated above, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment; **GRANTS** in part and **DENIES** in part Defendants' Motion to Strike Affidavit and For Sanctions; and **DENIES** Defendants' Motion for Leave to Amend and Supplement Motion for Summary Judgment.

{78} **WHEREFORE**, the Court hereby **DISMISSES**, with prejudice, Plaintiffs' claims for breach of fiduciary duty based on the improper use of partnership property and the deferral of maintenance, fraud based on the April 2009 withdrawal, and constructive fraud based on the April 2009 withdrawal.

**SO ORDERED**, this the 3rd day of January, 2013.